UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JACQUELINE KENNEDY-ROBEY | No. 19 CR 54<br><br>Judge Ronald A. Guzman |

### GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by and through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby submits the following sentencing memorandum.

Within weeks of defendant Jacqueline Kennedy-Robey's release from federal incarceration following her conviction in a multi-million dollar tax and fraud case, defendant launched a new scheme to obtain credit by lying to financing companies. She has displayed absolutely no respect for the law and poses a serious risk of recidivism. Accordingly, the government agrees with the recommendation of the Probation Office that defendant should be sentenced to 18 months' incarceration, a sentence at the high end of the advisory Guidelines range.

### IV. BACKGROUND[1]

Defendant was charged by complaint with mail fraud on January 22, 2019. Dkt. 1. She was arrested on January 31, 2019, and has remained in custody since her arrest. Dkt. 6. On February 21, 2019, defendant was indicted with two counts of

---

[1] The facts underlying this case and discussed herein are set forth in several sources, including the Presentence Investigation Report ("PSR"), the Government's Version of the Offense ("G.V.," attached to the PSR), the Government's Supplemental Version of the Offense ("Supp. G.V."), and the district court record ("Dkt.").

mail fraud in violation of 18 U.S.C. §1343. Dkt. 27. On April 17, 2019, she pleaded guilty to Count One of the indictment pursuant to a written plea agreement. Dkts. 40, 41. The sentencing hearing is currently scheduled for July 18, 2019 at 11:00 a.m.

V. **DEFENDANT'S OFFENSE CONDUCT**

Defendant committed the instant offense while serving her sentence for her prior federal fraud conviction. A brief summary of her prior fraudulent conduct is described below, followed by a summary of her current offense conduct.

    A. **Defendant's Prior Fraudulent Scheme**

In 2012, defendant Kennedy-Robey was the lead defendant in a multiple-count, multiple-defendant fraud indictment. 12 CR 284-1, Dkt. 1. Defendant was charged with two separate fraud schemes. First, the indictment alleged that defendant owned and operated a tax preparation business known as ATAP[2], where she filed false tax returns seeking inflated refunds on behalf of her customers. Second, the indictment alleged that defendant and her co-schemers engaged in a scheme to submit false unemployment insurance claims by creating fictitious companies, filing paperwork with state unemployment agencies to make it appear as if those companies had employees, and then filing unemployment claims on behalf of those purported employees.

Defendant was initially released pending trial. 12 CR 284, Dkts. 30, 31. Approximately five months later, in September 2012, the government moved to

---

[2] The indictment alleged that defendant owned and managed a tax preparation business operating under three different names, ATAP Financial Enterprises, Inc., ATAP Tax & Business Solutions, Inc., and ATAP Tax Services, Inc., collectively known as "ATAP."

2

revoke defendant's bond because, as detailed in an affidavit submitted by the case agent, its investigation revealed that defendant was continuing to commit unemployment insurance fraud while on bond. 12 CR 284-1, Dkt. 172. In response, defendant fled, and a warrant was issued for her arrest. 12 CR 284-1, Dkt. 174, 205. Defendant remained a fugitive for the next few months.

Defendant knew that she was required to appear in court but chose not to. In a letter she sent to Judge Lefkow, defendant wrote that "[w]hen I do turn myself in, it will be because I respect you + your position." 12 CR 284-1, Dkt. 194. She never turned himself in.

Defendant ultimately was located and arrested in December 2012 after an extensive search by law enforcement and use of a tracing device. 12 CR 284-1, Dkt. 205. She was found in an apartment on Chicago's south side, and had in her possession a number of documents consistent with her ongoing participating in fraud, including several spreadsheets of names and social security numbers, along with dollar amounts and corresponding state unemployment agencies. 12 CR 284-1, Dkt. 566 at 35. Additionally, law enforcement seized from the apartment defendant's handwritten notes and to-do lists, including a "to-do" list that included items such as "change phones monthly" and "move every 3-4 months," showing defendant had no intention of turning herself in. *Id*. Another handwritten note listed her "goals" which included "make $250k on ATAP taxes, make $400k with CASH, make $425k with others. $1.075M + 25K = $1.1 M by February 15, 2013." *Id*. at 36. These "goals" indicated that defendant was planning on continuing to engage in tax and other fraud

to try to make over a million dollars by the end of the early tax filing season. The Court found that defendant had continued to engage in unemployment insurance fraud even after her indictment. 12 CR 284-1, Dkt. 598 at 2.

Defendant pleaded guilty to several counts relating to the tax fraud and unemployment insurance fraud scheme without benefit of a plea agreement, and a contested sentencing hearing was held. 12 CR 284-1, Dkt. 449. After the hearing, Judge Lefkow found that the total loss caused by defendant's two schemes was over $4.8 million and her intended loss was over $14 million dollars.[3] 12 CR 284, Dkt. 589 at 1, 17. Judge Lefkow also found that defendant was an organizer or leader of the unemployment insurance scheme, as she "began the UI fraud scheme, recruited multiple accomplices, directed her co-conspirators, created companies in multiple states, coordinated her multiple 'runners,' directed others to collect personal information, distributed money to her co-schemers, and generally ran the scheme." *Id*. at 19.

The Court found defendant's advisory Guidelines range to be 210-262 months' incarceration. *Id*. at 23. It sentenced defendant to a total of 72 months' incarceration, followed by a term of supervised release for 3 years, with a total amount of restitution owed of $4,815,740. 12 CR 284-1, Dkt. 599.

### B. Defendant's Incarceration

After defendant was sentenced, she was transferred to a Federal Prison Camp

---

[3] Specifically, the Court found that the intended loss for the unemployment insurance fraud scheme was over $13.8 million and the intended loss for the tax scheme was over $500,000. 12 CR 284-1, Dkt. 589 at 5, 17.

4

in Bryan, Texas, where she remained until she was transferred to a halfway house in Chicago on or about August 2, 2017. She remained under the supervision of the halfway house until March 2, 2018. For the beginning of her time at the halfway house, she resided at the house. Later, from late September 2017 through March 2018, she was placed on home confinement under the supervision of the halfway house staff. Defendant was allowed to travel from the halfway house or her residence for approved reasons, including searching for employment.

### C. Defendant's Fraudulent Credit Applications

As defendant admitted in the plea agreement, while at and under the supervision of the halfway house, she submitted three fraudulent credit applications, seeking two loans to purchase vehicles and one credit card account. In each case, she falsely claimed she worked at ATAP making thousands of dollars a month. In reality, ATAP was no longer a functioning business. While defendant was under the custody of the halfway house staff, she was unemployed. Dkt. 41 at 5.

### *A. Fraudulently-Obtained Automobile Loan to Purchase the Mercedes-Benz SUV*

On September 14, 2017, defendant traveled to CarMax in Oak Lawn, Illinois, and purchased a 2012 Mercedes-Benz SUV. Defendant applied for a loan from Santander, and received an automobile loan of approximately $33,459.92. On the loan application, defendant falsely stated that she was employed by "ATAP FINANCIAL ENTERPRISES INC" as the "OFFICE MANAGER," making a gross salary of $5,000 monthly. The credit application further stated that defendant had been so employed for 12 years and 11 months (which would include the years

5

defendant spent in prison).

Defendant failed to make timely loan payments, and Santander repossessed this automobile in July 2018. When the vehicle was recovered, it had significant damage to the front bumper and fender. *See* G.V. Ex. C. The vehicle was sold at auction for only $9,200, causing a loss to Santander of $24,259.

### B. *Fraudulently-Obtained Credit Card Account*

On or about September 29, 2017, defendant applied for a credit card from Capital Bank, N.A., falsely claiming in her loan application that she had an annual income of $72,000. Defendant then used the credit card to purchase goods and services, including to pay for rental vehicles, and failed to pay the credit card bill in a timely manner, leaving a loss of $1,172.13.

### C. *Fraudulently-Obtained Automobile Loan to Purchase the Kia SUV*

On November 15, 2017, defendant and Individual A went to World Kia Joliet and purchased a Kia Sportage SUV. According to BOP records, on that date, defendant received permission to leave her home for "employment and school search." Defendant's reason for leaving her home was a false pretense; in reality, she traveled to Joliet to purchase the automobile.

Defendant and Individual A received a loan of $24,069.65 to purchase the automobile from Regional Acceptance Corporation. On their respective loan applications, Individual A and defendant each claimed to work at ATAP, with defendant falsely claiming that she was employed by "ATAP FINANCIAL SERVICES" as the "OFFICE MANAGER," making a monthly salary of $5,294. The

6

credit application further stated that defendant had been so employed for 14 years and 0 months.

Defendant also created fictitious pay stubs for herself and Individual A, purportedly from "ATAP Financial Enterprises, Inc." which were provided to the dealership and later forwarded to Regional Acceptance Corporation. Defendant's paystub claimed that she had made $53,634.70 in 2017, as of the date of the paystub. The fictitious pay stubs corroborated the false statements about employment on the loan applications.

In order to create the fictitious paystubs, defendant created an account with an online payroll service, Intuit Payroll, and used that service to generate the fictitious paystubs. *See* G.V. Exs. E, F.

Defendant and Individual A failed to make timely payments to Regional Acceptance Corporation, and the Kia SUV was ultimately repossessed and sold at auction for $11,400, causing a loss to Regional of $12,669.65. *See* G.V. Ex. J.

**III. ARGUMENT**

Before imposing a sentence of imprisonment or a term of supervised release, the Court must calculate the applicable advisory Guidelines range and consider the factors set forth in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 46 (2007). If a term of supervised release is imposed, the Court must consider defendant's offense conduct and the factors set forth in 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D) in fashioning specific supervised release conditions. *See United States v. Thompson*, 777 F.3d 368, 377 (7th Cir. 2015); *United States v. Siegel*, 753 F.3d 705, 716-17 (7th Cir. 2014). In this case a sentence within the

advisory Guidelines range is sufficient but not greater than necessary to satisfy the goals of Section 3553(a).

### A. The Advisory Sentencing Guidelines Range

The advisory Guidelines calculations are based on the November 2018 version of the Sentencing Guidelines Manual. As discussed below, the government and the PSR agree on the application of the Guidelines in this case.

#### 1. Offense Level Calculations

A. <u>Base Offense Level</u>. The parties agree that base offense level is 7, pursuant to Guideline § 2B1.1(a)(1). Dkt. 41 at 7.

B. <u>Enhancement for Loss</u>. The parties agree that defendant's offense level is increased by 4 levels, pursuant to Guideline § 2B1.1(b)(1)(C), because the loss exceeded $15,000, but was less than $40,000. Dkt. 41 at 7.

More specifically, for the Capital Bank credit card, the loss is $1,172.13, which is the amount of principal that was "charged off" when the account was closed after Kennedy-Robey's failure to make timely payments.

As for the two automobile loans, Application Note 3(E)(ii) to Guideline § 2B1.1 provides that for loans where collateral is pledged, such as an automobile loan, the loss amount is decreased by "the amount the victim has recovered at the time of sentencing from the disposition of collateral," or if the collateral has not been recovered and/or disposed of by that time, "the fair market value of the collateral at the time of sentencing." Because both vehicles have been repossessed and sold at auction, the loss amount for those two vehicle loans are the original loan amount minus the amount of the auction sale.

Therefore, the updated loss and restitution table is as follows:

| Lender | Loan Amount | Loss |
| --- | --- | --- |
| Santander | $33,459 | $24,259 |
| Capital Bank | N/A (credit card), but "Charged Off" amount is $1,172.13 | $1,172.13 |
| Regional Acceptance Corporation | $24,069.65 | $12,669.65 |
| TOTALS | $58,700.78 | $38,100.78 |

    C. <u>Enhancement for Sophisticated Means</u>. The government's position is defendant's offense level is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(10)(C), because defendant's offense involved sophisticated means and she intentionally engaged in and caused the conduct constituting sophisticated means. The Probation Office agrees that this enhancement is applicable; in the plea agreement, defendant reserved the right to argue that this enhancement does not apply. Dkt. 41 at 7; PSR ¶ 35.

  Defendant's conduct meets the definition of "sophisticated means." In her plea agreement, she admitted that she created fictitious paystubs and provided them to World Kia Joliet and Regional Acceptance Corporation as support for the fictitious employment and income information for herself and Individual A on their loan applications. By 2017, there was no longer a business named "ATAP". Her creation and use of a paystub purportedly from ATAP was part of a scheme to use a "fictitious entity" to conceal her true assets and income. Application Note 9(B) to § 2B1.1 states that the use of "fictitious entities" to hide "assets or transactions. . . ordinarily indicated sophisticated means."

Case law supports application of a sophisticated means enhancement to a defendant who creates fake paystubs and submits them in support of her loan applications. *See, e.g., United States v. Ojemen*, 465 Fed.Appx. 69, 72 (2d Cir. 2012) (production of forged paystubs and W-2s to support fraudulent loan applications and to conceal the scheme is sophisticated means); *United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011) (holding a real estate investment scheme was sophisticated when it included the defendant's creation of "phony documents to conceal fraudulent transactions from victims and authorities" and when the defendant "sent trumped-up letters to clients falsely reassuring them that their investments were safe."); *United States v. Madoch*, 108 F.3d 761, 766 (7th Cir. 1997) (affirming a sophisticated means enhancement for a return preparer who created false Forms W-2 and attached them to tax returns to obtain fraudulent refunds); *United States v. Kennedy*, 12 CR 284-1, Dkt. 589 at 5 (Lefkow, J.) (same).

    D. <u>Acceptance of Responsibility</u>. The government agrees that a two-level reduction for acceptance of responsibility under Guideline § 3E1.1(a) is appropriate.

    **2. Criminal History Category**

The government and the Probation Office agree that defendant has one prior conviction that yields three criminal history points – the fraud conviction described above. PSR ¶ 52. Because defendant was serving a term of incarceration at the halfway house at the time of her instant offense, she receives an additional two criminal history points under Guideline § 4A1.1(d). PSR ¶ 53. Therefore, her total

criminal history points are five, which is criminal history category III.

### 3. Advisory Guidelines Range and Supervised Release Term

The government agrees with the following calculations of the Probation Office: defendant's total offense level is 11 and her criminal history category is III, resulting in an advisory Guidelines range of 12 to 18 months' imprisonment. PSR ¶ 125.

### B. A Guidelines Range Sentence Is Appropriate Under Section 3553(a)

#### 1. The Nature and Circumstances of the Offense

Defendant's offense is a serious one – she brazenly inflated her income in order to obtain loans and credit accounts to which she would not otherwise have qualified. Once she obtained the credit, she failed to make timely payments, causing losses to the lenders. Her offense involved a pattern of fraudulently seeking loans from lenders, obtaining credit on three separate occasions within just a few months.

#### 2. Defendant's History and Characteristics

Defendant has a lengthy history of committing fraud. Her prior federal fraud conviction involved her leading not one but two lucrative fraud schemes – schemes that did not stop even after she was charged federally. Remarkably, within weeks of being released from federal prison and while still in the custody of the Bureau of Prisons at the halfway house, she immediately began committing fraud again. She had every opportunity at the halfway house to work to find legitimate employment, with the help of BOP staff. Instead, she turned to fraud to obtain vehicles, goods, and services – taking out lines of credit she knew she had no ability to repay.

Defendant also has shown absolutely no respect for the law. During her prior

federal case, she continued to commit fraud on bond, in clear violations of the Court's conditions of release. When her fraudulent activities were discovered, instead of turning herself in, she remained a fugitive for months, all the while committing fraud. She sent the Court a letter stating she knew she was supposed to appear in court, but she was not going to until she was ready. As soon as she was released to the halfway house, she went right back to committing fraud. She lied to halfway house about why she needed to leave the residence and was not deterred in any way by the rules and monitoring of the halfway house staff.

During defendant's last federal case, she was given the gift of extraordinary leniency. Although her Guidelines range was 210-262 months' incarceration, she was only sentenced to 72 months' incarceration. Defendant could have used that gift of early release to get a legitimate job and work on paying her enormous restitution obligation. Instead, she decided to buy herself a nice SUV by deceit, skipping out on her obligations to pay and leaving the lender with a damaged vehicle. Once she obtained that vehicle, she also got a credit card and a second car – again, through her lies, getting money she knew she had no ability to repay.

### 3. The Need To Provide Just Punishment, Afford Adequate Deterrence, Protect the Public, and Promote Respect for the Law

For this defendant, specific deterrence is a significant concern. No conditions of release have been able to prevent the defendant from committing fraud – not her pretrial release conditions in her previous case, and not the various rules and regulations at the halfway house. Although she has already spent years in jail because of her fraudulent activities, she was not deterred for even a month before

starting the fraud right back up again. As discussed above, defendant has no respect for the law or for the rules of the Court or of the Bureau of Prisons. Nothing short of a significant term of incarceration will protect the public from defendant's fraudulent ways.

As for general deterrence, fraud in lending, particularly automobile lending, continues to be a concern in this district and nationwide. In recent years, several automobile dealership employees have been charged in this district after assisting customers in putting fictitious employment information on loan applications. *See, e.g., United States v. Chester Meeks*, 16 CR 45; *United States v. Pierre Campbell et al.*, 19 CR 462; *United States v. Hani Hamden*, 13 CR 812. The need for general deterrence is particularly strong for economic crimes, which are often premeditated, lucrative, and difficult for law enforcement to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

      **C.**    **Recommended Conditions of Supervised Release**

Given the circumstances of the offense, and the defendant's history and characteristics, the government recommends the maximum term of five years' supervised release.

The applicable mandatory conditions of supervised release under 18 U.S.C. § 3583(d) are set forth on page 22 of the PSR. The government has no objection to the recommended discretionary and special conditions of Supervised Release set forth

on pages 22 through 27 the PSR, and concurs with the Probation Officer's rationale for these conditions.

Specifically, the government agrees that discretionary conditions (1), (4), (5), (6), (7), (8), (9)[4] and special conditions (3), (4), (11) and (13) promote the statutory factors of affording adequate deterrence to criminal conduct, protecting the public from further crimes by the defendant, and assisting the defendant in reintegrating into society upon her release. Specifically, discretionary condition (5) and special condition (4) limit the defendant's access to personally identifiable information and financial account information of third-parties, which will help protect those individuals as defendant has a history of identity theft[5] and fraud.

The government further agrees that discretionary conditions (14), (15), (16), (17), and (18) promote the statutory factor of allowing for effective monitoring of defendant during any supervised release term imposed.

Additionally, as discussed below, the defendant will have a restitution obligation. In order to facilitate and monitor the repayment of those funds, the following conditions are appropriate: discretionary condition (4) and special conditions (5), (6), (7), (8), and (10).

---

[4] In a letter sent to this Court, defendant indicated she wished to receive additional mental health treatment. Dkt. 39.

[5] *See, e.g.*, 12 CR 284-1, Dkt. 566 at 22-23 (explaining the personally identifying information of multiple individuals who had their tax returns prepared at ATAP was used by defendant and her co-schemers to file fraudulent unemployment claims. The individuals told law enforcement they did not give defendant permission to file an unemployment insurance claim in their name).

D.  **Restitution, Fine, and Forfeiture**

As stated above, defendant owes restitution in the following amounts: $24,259 to Santander; $1,172.13 to Capital Bank; and $12,669.95 to Regional Acceptance Corporation.

As set forth in the PSR, defendant still owes approximately $4,673,253.71 in restitution from her previous case, 12 CR 284-1. PSR ¶ 118.

Because of these large restitution obligations, the government agrees that a fine is inappropriate in this case. PSR ¶ 123.

IV.  **CONCLUSION**

For the reasons stated above, this Court should sentence Jacqueline Kennedy to 18 months' imprisonment, followed by a term of five years of supervised release.

        Respectfully submitted,

        JOHN R. LAUSCH, JR.
        United States Attorney

By:   /s/ *Michelle Petersen*
       MICHELLE PETERSEN
       ANDRIANNA KASTANEK
       Assistant U.S. Attorneys
       219 South Dearborn Street, Room 500
       Chicago, Illinois 60604
       (312) 886-7655

Dated: July 8, 2019