UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JAQUELINE KENNEDY-ROBEY,<br><br>    Defendant. | No. 1:19-CR-54<br><br>Judge Ronald Guzman |

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant Jaqueline Kennedy-Robey, through her undersigned counsel, submits her Sentencing Memorandum and Objections to the PSR.

Based on the facts of this case, the sentencing guidelines, and Jackie's personal characteristics, defense counsel requests that the Court impose a sentence of 8 months.

### I. PSR objections

#### a. Sophisticated-means enhancement

The two-point enhancement for sophisticated means recommended by the PSR ¶ 35 should not be applied. The PSR argues that the enhancement applies here because "the offense involved the creation of fictitious pay statements that were provided to lenders in support of claims of employment and income from a fictitious employment entity." *Id.*

Two points are salient. First, as a factual matter, ATAP was not a fictitious entity. While the company was involuntarily dissolved in 2006, it was a duly registered Illinois corporation, according to records of the Illinois Secretary of State:

| | | | |
|---|---|---|---|
| **CORPORATION FILE DETAIL REPORT** | | | |
| File Number | 64378252 | | |
| Entity Name | ATAP FINANCIAL ENTERPRISES, INC. | | |
| Status | DISSOLVED | | |
| Entity Type | CORPORATION | Type of Corp | DOMESTIC BCA |
| Incorporation Date (Domestic) | 07/20/2005 | State | ILLINOIS |
| Agent Name | JACQUELINE D KENNEDY | Agent Change Date | 07/20/2005 |
| Agent Street Address | 3814 W 84TH ST | President Name & Address | |
| Agent City | CHICAGO | Secretary Name & Address | INVOLUNTARY DISSOLUTION 12 01 06 |
| Agent Zip | 60652 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 00/00/0000 | For Year | 2006 |

Return to the Search Screen

**WOULD YOU LIKE TO REINSTATE YOUR DISSOLVED CORPORATION?**

YES! I would like to reinstate!

https://www.ilsos.gov/corporatellc/CorporateLlcController (last visited July 9, 2019). Indeed, as the online records make clear, it is possible to reinstate the dissolved corporation at any time, subject to filing missing annual reports with the Secretary of State and other administrative issues. *See* 805 ILCS 5/12.45. Moreover, corporations maintain their existence even after dissolution for the purpose of winding up its affairs. *See* 805 ILCS 5/12.30. This includes the payment of back taxes, which are still owed by ATAP.

Second, the use of fictitious pay statements to obtain a loan is not necessarily sophisticated. Application Note 9 to USSG § 2B1.1 discusses the use of this enhancement:

> For purposes of subsection (b)(10)(C), *"sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.* For example, in a tele-marketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

(emphasis added). As the comment makes clear, the enhancement is normally employed in situations where the offense is concealed. That is not the case here, where the offense involved merely the use of falsified supporting documentation and did not involve any attempts to evade detection using additional fraudulent documents. *Cf., e.g.,* United States v. Ojemen, 465 Fed.Appx. 69, 72 (2d Cir. 2012) ("Ojemen then produced further fraudulent documents to conceal his criminal activities from his supervising probation officer. We easily conclude that this *complex web* of fraud warranted a U.S.S.G. § 2B1.1(b)(9)(C) enhancement." (Emphasis added.)).

This was instead a garden-variety fraud that required no additional steps beyond Jackie misstating her income on a pay stubs in support of the loan applications. The limited and unsophisticated fraud here is significantly different than cases such as United States v. Landwer, 640 F.3d 769, 770 (7th Cir. 2011), in which the defendant defrauded at least seventeen elderly or financially distressed victims by operating a fictitious financial firm and posing as a lawyer and CPA, or United States v. Madoch, 108 F.3d 761, 766 (7th Cir. 1997), where the defendant "repeatedly created false W-2 Forms, phony itemized deductions and false employment records, and filed these under the Social Security numbers of everyone

3

from knowing accomplices, to unwitting clients, to the dead and the young." *Cf. also* [United States v. Peterson, 891 F.3d 296, 299 (7th Cir. 2018)](#) ("In this case, the defendant engaged in *significant efforts* to conceal the source of the downpayment and the kickbacks paid." (Emphasis added.)).

This case is instead similar to [United States v. Fendler, 2018 U.S. Dist. LEXIS 126651, at \*4-\*6 (N.D. Ill. July 30, 2018)](#), in which the court declined to impose the sophisticated-means enhancement. The court observed, "Here, there is no question that the defendant was stealing money from his clients in a variety of ways over a lengthy period of time. But there was nothing particularly complex or intricate about the manner in which the defendant committed his fraud. . . . Moreover, the fact that the defendant's company received numerous complaints regarding these unauthorized transactions also strongly suggests that the defendant did not make elaborate efforts to avoid detection." [*Id.* at \*5-\*6](#). As in *Fendler*, the fraud here involved nothing more than falsified income statements, and Jackie did nothing more to conceal the fraud. The enhancement should therefore not be applied.

### b. Employment status at the time of the offense

Although Jackie's income statements were in fact falsified, she was employed at the time of some of the offense conduct, specifically the November 2017 RAC car loan. As the PSR notes at paragraph 113, Jackie was employed by Uber Eats from October 2017 to November 2017 earning about $3,466.66 per month. It is therefore incorrect to say that she had no ability to repay the loans.

II. **The seriousness of the offense**

There is no doubt that fraud is a serious crime, and the amount of the loss in this case was not insignificant. But that is not to say that the sentencing guidelines adequately reflect the seriousness of the crime. When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the meeting of the purposes of sentencing, 28 U.S.C. §991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a starting point. 28 U.S.C. §994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with front-line actors in the criminal justice system. See 28 U.S.C. §991(b)(1)(C), §991(b)(2), §994(o), §995(13), (15), and (16).

But not all guidelines were developed in this manner. See *Gall v. United States*, 552 U.S. 38, 46& n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline does not exemplify the Commission's exercise of its characteristic institutional role, because the Commission did not take account of empirical data and national experience, the sentencing court is free to conclude that the guideline yields a sentence greater than necessary to achieve § 3553(a)'s purposes, "even in a mine-run case". *Id.* at 109-10.

Importantly, the most significant operable guideline section here—the loss table in USSG § 2B1.1 —is not based on empirical data of past practice or on national experience since its original adoption (previously § 2F1.1). Before the guidelines,

5

first offenders convicted of the most sophisticated frauds and involving the highest loss amounts who were sentenced to prison served, on average, a prison sentence of 18 to 24 months, and 18% of defendants committing those most serious fraud offenses received probation. *See* U.S. Sentencing Commission, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* at 30, 33 (1987). But when the Commission adopted the original guidelines in 1987, it decided to abandon the touchstone of prior past practice with respect to white collar offenses. *See* Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sentencing Rep. 180. The Commission instead required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 2 to 8 months and no more than 30 to 37 months for defendants in Criminal History Category III. See USSG § 2F1.1 (1987).

The Commission's deterrence rationale was not based on empirical evidence. Indeed, the empirical research regarding white-collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. See David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

6

The Second Circuit has expressly recognized this problem and indicated that the history of the fraud guidelines is a material factor to consider when determining a sentence. See *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider."); *see also id.* ("We do not rule that the sentences were imposed in error. We conclude only that a remand is appropriate to permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence.")

Consequently, while undoubtedly a serious crime, the guidelines for fraud are not based on any empirical evidence and thus arbitrarily overstate the seriousness of the offense. Sentencing data for fraud offenses reflect this reality, showing that more than half of all fraud offenders receive a below-guidelines sentence:

| PRIMARY OFFENSE | TOTAL | WITHIN RANGE | | ABOVE RANGE[2] | | GOV'T SPONSORED BELOW RANGE | | NON-GOV'T BELOW RANGE[3] | |
|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % |
| Fraud | 5,967 | 2,552 | 42.8 | 124 | 2.1 | 1,617 | 27.1 | 1,674 | 28.1 |

U.S. Sentencing Comm'n, Sourcebook of Federal Sentencing Statistics, *Departures and Variances*, table 27A (2017 ed.). While the government has requested a sentence that is within the guidelines range, it is well outside of the normal range of sentences actually imposed for crimes of this nature.

Among the statutory factors that the Court is bound to consider in arriving at a sentence is "the need to avoid unwarranted sentence disparities among defendants

7

with similar records who have been found guilty of similar conduct". 18 U.S.C. § 3553(a)(6). In fiscal year 2017, the median sentence for defendants sentenced under USSG § 2B1.1 was 12 months. *See Sentence Length in Selected Primary Sentencing Guidelines*, table 13A. Of more importance, the median sentence length for Category I

At the district level, the downward trend continues. In the Northern District of Illinois in 2017, of the 14 defendants in Category III who were sentenced under the fraud guidelines in USSG § 2B1.1 and received a prison sentence, the median sentence was only *18* months. *See* Table 14A, Sentence Length for Offenders in Each Criminal History Category by Primary Sentencing Guideline. Even Category VI offenders sentenced under § 2B1.1 received a median sentence of only 36 months, which is 5 months below the low end of the Government's requested sentence here.

Consequently, it is apparent that the Government's position that a sentence at the top of the guideline range is appropriate does not comport with the sentencing trend in this district. In fact, of the 193 defendants in all criminal history categories who were sentenced under § 2B1.1 in this district in 2017, only 35 (that is, 18%) received a guideline sentence. *See* Table 28-8, Sentences Relative to the Guideline Range by Each Primary Sentencing Guideline. The vast majority of the sentences were instead below guidelines, and none were above guidelines. *Id.* It is therefore proper for the Court to depart downward from the advisory guidelines range in this case.

III.  History and characteristics of the defendant

Jackie's personal history is discussed at length in the PSR, which notes she has little prior criminal history until her 2012 fraud case. As her father noted during an interview in her prior PSR investigation for that case, Jackie is a "loving kid" and a "good person" who "got caught up" in the fraud scheme. PSR ¶ 74. Her father also noted that Jackie has "emotionally struggled with being overweight and experienced 'rather difficult relationships'." *Id.*

Given her near non-existent criminal history prior to 2012, one wonders why Jackie suddenly engaged in criminal activity in 2012 and again upon her release from prison in 2017. The answer is Jackie's ongoing struggles with her mental health.

As the PSR notes, Jackie was diagnosed "borderline bi-polar" in 1997 after a DCFS incident. PSR ¶ 86. Shortly after her detention hearing in 2012 for her prior fraud case, Jackie was referred for a psychological evaluation by court order. *See United States v. Kennedy-Robey*, No. 1:12-CR-284, [207]. According to a psychological evaluation conducted in July 2012, Jackie was diagnosed with adjustment disorder and began to receive counseling. PSR ¶ 87.

Unfortunately, the counseling did not continue after Jackie was released from prison to a halfway house in 2017, and she was not in treatment for her ongoing mental-health conditions during the offense conduct during September through November 2017. Jackie did not resume receiving mental-health treatment until April 2, 2018, when she underwent another mental-health assessment. PSR ¶ 90. After this assessment, Jackie began attending counseling sessions twice per month, and she

9

continued doing so up until her arrest in this case in 2019. During that time, Jackie attended her counseling sessions as scheduled and was meeting her treatment goals, which included being able to identify the emotions behind her thoughts and behaviors, and she was better able to manage her anger. PSR ¶ 91. Jackie continued to have difficulty with irrational thinking, such as jumping to conclusions and making up scenarios.

Based on this history, it is apparent that Jackie's lack of mental-health treatment around the time of the offense likely contributed to her criminal conduct so soon after release from prison. It is also notable that the offense conduct ceased no later than November 2017, and did not resume after Jackie began receiving treatment in April 2018. Any sentence must therefore take into account Jackie's success while in treatment, and her difficulties when she is not.

Among the relevant factors the Court also must consider at sentencing is the need for the sentence imposed to provide the defendant with needed medical care. 18 U.S.C. § 3553(a)(2)(D). Menta-health treatment options are limited within the BOP but are readily available outside of it while on supervised release. A shorter sentence that allows just punishment but ensures that Jackie resumes appropriate mental-health treatment through the Probation Office will therefore significantly aid in her rehabilitation.

Moreover, Jackie suffers from significant medical issues that require treatment not necessarily available from BOP. Jackie suffers from morbid obesity, high cholesterol, diabetes, and heart disease, as well as hidradentitis. While in pretrial detention in this case, on March 13, 2019, Jackie was admitted to the emergency

10

room at Thorek Hospital due to a worsening cough and shortness of breath, where she was treated for a lung infection and pneumonia. PSR ¶ 82.

IV. **Deterrence does not require a lengthy sentence**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 CRIME & JUST. 1, 28 (2006). "Three National Academy of Science panels. . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. See Andrew von Hirsch et al., CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH (1999), *summary available at* http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, "the correlations between *sentence severity* and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2 (emphasis added). The report concluded

11

that the studies reviewed do not provide a basis for inferring that increasing the severity of sentences correspondingly increases deterrent effects. *Id.* at 1.

More recently, in May 2016, the U.S. Department of Justice's National Institute of Justice published a fact sheet entitled "Five Things About Deterrence", which summarized the research that has been done on deterrence. Three of the key findings include: (1) "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment"; (2) "[s]ending an individual convicted of crime to prison isn't a very effective way of deterring crime; and (3) "[i]ncreasing the severity of punishment does little to deter crime." *Id.*; *see also generally* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUSTICE 199-263 (2013).

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview*. Among the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)." Importantly, a longer sentence of imprisonment makes a defendant *more* likely, not less likely, to reoffend. The study noted:

> Offenders with shorter lengths of imprisonment generally had lower recidivism rates. For instance, offenders with sentences of imprisonment of fewer than six months had the lowest rearrest rate at 37.5 percent, followed by offenders with sentences from six to 11 months (50.8 percent), and 12 to fewer than 24 months (50.8%). Conversely, the highest recidivism rates are generally found among offenders with longer sentences. Those with sentences from 60 months to fewer than 120 months had the highest rate (55.5%), followed closely by those with 24 to fewer than 60 months (54.0%), and 120 months or more (51.8%).[55]

*Id.* at 22. That is, defendants sentenced to less than six months in prison were about half as likely to reoffend as those sentenced to between 24 and 60 months. A sentence of 18 months in this case, as the Probation Office and the Government recommend, would therefore be *less* likely to satisfy the goal of deterrence than the sentence recommended by the defense.

## V. A fine and interest on restitution are not appropriate

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a) (emphasis added). The guidelines further note that the Court "may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." USSG § 5E1.1(f); see also USSG § 5E1.1(e) (authorizing periodic restitution payments).

As the PSR states, Jackie has no present reliable income and thus has no ability to pay a fine or make any lump-sum payments toward restitution,

13

particularly given the size of the still-unpaid restitution order in her prior case. Consequently, the defense requests that the Court decline to impose a fine and, to the extent restitution is ordered, to order restitution to be paid in installments. Further, the Court should waive interest on any restitution or fine. *See* 18 U.S.C § 3612(f)(3) ("If the court determines that the defendant does not have the ability to pay interest under this subsection, the court may—(A) waive the requirement for interest").

## VI. Objections to the recommended conditions of supervised release

*Discretionary condition (7):* This condition imposes a restriction on excessive alcohol consumption. There is no evidence that Jackie is currently dependent on alcohol, nor is there any connection between Jackie's crime of conviction and alcohol use. This means that there is no basis for imposing either an absolute ban on consumption of alcohol or a ban on excessive use of alcohol. *See, e.g.*, *United States v. Baker*, 755 F.3d 515, 524 (7th Cir. 2014) (vacating no-alcohol condition where there was "no evidence that Baker's alcohol use has contributed to his repeated criminal conduct or that Baker is dependent on alcohol"); *United States v. Kappes*, 782 F.3d 828, 849 (7th Cir. 2015) (vacating excessive-use condition because, "given the lack of any apparent connection between alcohol use and Jurgens' offense, we think the imposition of this condition without findings was not harmless").

*Discretionary condition (16):* As the Seventh Circuit recently noted regarding visitation conditions such as this one, "In a number of cases, we have disapproved of such conditions if they failed to qualify when or where a probation officer may

14

impinge on his supervisee's liberty." *Smith*, 2018 U.S. App. LEXIS 29049, at *7; *see also id.* (citing cases). While the Seventh Circuit noted some tension in the cases on this issue, it has declined to resolve the split. *See id.* Consequently, the line of cases disapproving of unlimited visitation restrictions is still good law.

Counsel also objects to permitting a probation officer to visit Jackie at work. Workplace visits by probation officers can be disruptive to the workplace and may endanger Jackie's ontinued employment. Counsel has no objection to visitation at other locations at reasonable times, provided that what is "reasonable" is defined and properly qualified.

> Respectfully Submitted,
>
> JACQUELINE KENNEDY-ROBEY
>
>
> *s/James G. Vanzant*
> Attorney for Defendant

James G. Vanzant, Esq. (ARDC 6304196)
BLAINE & VANZANT, LLP
922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
Email: jgv@blainevanzant.com

15

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the foregoing document was filed and served on all counsel of record via the Court's ECF system.

*s/James G. Vanzant*